UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUNO MOURA,
     Plaintiff,

v.
                                         CIVIL ACTION NO. 25-10274-MPK[1]

FRANK BISIGNANO,[2]
Commissioner of Social Security,
     Defendant.

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (#14)
AND DEFENDANT'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER (#18)

KELLEY, U.S.M.J.

I. Introduction.

Plaintiff Bruno Moura seeks reversal of the decision of the Commissioner of the Social Security Administration denying his Title II application for disability insurance benefits. (##14, 15.)  In turn, Defendant submitted a motion to affirm the Commissioner's decision together with

---

[1] With the parties' consent, this case has been reassigned to the undersigned for all purposes, including the entry of judgment. (##12, 13.)

[2] This case was originally filed against Michelle A. King, then the Acting Commissioner of the Social Security Administration. Frank Bisignano was sworn into office as Commissioner of the Social Security Administration on May 7, 2025. Pursuant to Fed. R. Civ. P. 25(d), Frank Bisignano, in his official capacity, is automatically substituted as the defendant.

a memorandum in support. (##18, 19.) Plaintiff filed a reply brief. (#22.) With the administrative record having been filed (#11), the cross motions are ready for decision.

## II. Background.

### A. Procedural History.

Moura filed a Title II application for a period of disability and disability insurance benefits in December 2021 claiming disability onset on May 5, 2017. (AR at 461-462.[3]) The claim was initially denied in July 2022, and then again on reconsideration in April 2023. (AR at 367-375; 378-386.) Plaintiff submitted a request for a hearing. (AR at 408.) Administrative Law Judge ("ALJ") Sean Teehan held a telephonic hearing[4] on September 27, 2023, during which Moura testified, as did an impartial vocational expert. (AR at 44-78.)

On February 28, 2024, the ALJ issued an unfavorable decision. (AR at 18-31.) The Appeals Council denied review. (AR at 1-7.) The complaint in this case was filed on February 4, 2025. (#1.)

### B. Medical Evidence.

The medical treatment records in this case are voluminous. Those records have been thoroughly reviewed but will be recounted here in an abbreviated fashion since Plaintiff's arguments focus on the ALJ's analysis of the opinions of non-treating physicians, Dr. Robert Terlato, a State Agency Medical Consultant, and Dr. Scott Haas, a Consultative Psychological Examiner, which will be described in more detail.[5]

---

[3] The abbreviation "AR" stands for the Administrative Record.

[4] Moura and his attorney agreed to participate via telephone. (AR at 18.)

[5] Plaintiff has limited the "statement of relevant evidence" in his motion "to facts that are pertinent to the issues raised in this request for review." (#15 at 4.)

1. <u>Treatment Records.</u>[6]

On May 5, 2017, Moura injured his left shoulder at work, which in turn exacerbated a preexisting neck injury. (TR at 580.) An August 2017 MRI confirmed a C5-C6 paracentral disc herniation potentially compromising the left C6 nerve root. (AR at 685.) On May 21, 2018, Plaintiff underwent a C5-C6 discectomy and fusion with no complications. (AR at 601, 603.)  A CT scan of his cervical spine in June 2018 revealed a stable fusion with no indication of any neural compression. (AR at 630-663.) An October 2018 MRI similarly showed a stable fusion with no signs of neural compression at any level. (AR at 632-633.) In November 2018 an independent medical examination undertaken for his workers' compensation claim concluded that Moura would be able to return to work without restrictions if he engaged in the post-surgical physical therapy prescribed, but in which he had failed to participate. (AR at 2364-2367.)

Plaintiff had another MRI of his shoulder in June 2019 which revealed no evidence of rotator cuff, biceps tendon, or glenoid labrum tears, all indicative of a successful surgical result. (AR at 635-636.) A workers' compensation medical examination in August 2019 determined that Moura was able to perform light duty work (AR at 2369-2372), while another independent medication examination in September 2020 concluded Plaintiff was able to work full time performing light duty activity with a 20-pound lifting restriction and no repetitive overhead lifting. (AR at 2373-2380.)

In December 2020 Moura underwent an arthroscopic repair of his left shoulder when conservative measures, including physical therapy, did not alleviate his symptoms. (AR at 1195-1197.) An examination in April 2021 documented an onset of cubital tunnel syndrome symptoms and diminished grip strength. (AR at 2382-2385.) An April 2022 EMG, however, indicated a mild

---

[6] Plaintiff has not submitted any medical opinions regarding disability from his providers.

left-sided ulnar mononeuropathy at the elbow together with other findings that suggested the impairment was not debilitating as contended. (AR at 627-629.) These findings were buttressed by Moura declining a referral for a surgical consult, his reporting of having only occasional numbness in his left hand, and the final workers' compensation independent medical examination performed on February 21, 2023. (AR at 2386-2389.)

Despite alleging ongoing debilitating pain, Plaintiff's medical records show that from May 2017 through December 2022, Moura repeatedly reported no acute distress when seeking treatment and presenting for examinations such that he had essentially benign physical exams over any twelve-month period. (AR at 27, including citations.)

Although he testified about depression and anxiety arising from his alleged diminished physical capacity, Moura declined a referral to a mental health provider to address his symptoms and, in fact, did not receive any mental health treatment during the relevant period. (AR at 28.)

2. Impartial Medical Evaluation and State Agency Examinations/Assessments.

State Psychological Examiner Scott Haas, Ph.D., conducted a consultative examination of Plaintiff on April 28, 2022. (AR at 1132.) Based on the examination, Dr. Haas opined that Moura was capable of comprehending information; could learn tasks of varying complexity; could learn new tasks with ordinary training; could complete basic forms; could respond to two or three-step instructions; could follow instructions; would not need daily supervision; could interact with the general public; could respond to varied supervision; could work cooperatively with others; could accommodate routines and time constraints; could respond to the demands of others; could follow rules and directions; and could cope with novel or unexpected situations. (AR at 1135.)

On June 29, 2022, State Agency Medical Consultant Dr. Robert Terlato determined that physically Moura could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds,

4

stand/walk about 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. (AR at 370.) Regarding postural limitations, Plaintiff could occasionally climb ramps/stairs, ladders, ropes and scaffolds, balance, stoop and crawl. (AR at 371.) He could frequently kneel and crouch. *Id.* Moura had unlimited manipulation limitations reaching in front and/or laterally, fingering, and feeling, but was limited on the left in reaching overhead and handling. *Id.* Dr. Terlato found no visual or communicative limitations. *Id*. Plaintiff did have environmental limitations in that he was to avoid concentrated exposure to extreme cold and hazards, but otherwise he was unlimited. *Id.*

Upon reconsideration on February 28, 2023, Dr. Jose Ruiz concurred with Dr. Terlato's findings except Dr. Ruiz determined that Moura's left overhead reaching was limited to occasionally due to left shoulder dysfunction and left gross manipulation was limited to frequent due to ulnar neuropathy. (AR at 380, 382-384.)

Regarding mental residual functional capacity, on initial administrative review Plaintiff was found to have the ability to focus sufficiently on simple tasks at a reasonable pace. (AR at 372-373.) Upon reconsideration, the initial findings were deemed to be reasonable. (AR at 382.) It was determined that Moura could understand simple instructions with some variability in focus and preoccupation with chronic pain expected to interfere with following detailed instructions. (AR at 384-385.)

C. Plaintiff's Hearing Testimony.

Moura completed the ninth grade in school. He never obtained a high school equivalency diploma or received any vocational training. (AR at 50.) He lives in a single-family house with his wife, three biological children and two foster children. (AR at 65.)  At the time of the hearing, he was not working, but his wife was employed as an orthodontist's assistant.[7] Plaintiff had been

---

[7] Plaintiff explained that he and his wife also received funds as foster parents. (AR at 50.)

receiving workers' compensation but in July 2021 had reached an $80,000 lump sum agreement in that case. (AR at 51.)

The last time Moura worked was in May 2017, when he was employed as a driver for a medical device company.[8] *Id*. His job was to pick up medical instruments from the company facility, deliver them to hospitals, and then collect the instruments to return them to the company for repairs. *Id*. On average Plaintiff carried around 25 to 30 pounds. (AR at 52.) Every Friday night he would pick up medical instruments at Logan Airport, deliver them to the company warehouse for repairs and, once the repairs had been completed, he would deliver the medical instruments back to Logan Airport on Saturday morning. *Id.* The Logan Airport loads weighed between 100 to 125 pounds. *Id.*

Moura testified that he was injured at work on May 5, 2021, and that he remained disabled from performing any work because his health had not improved since he was hurt and, in fact, he felt his medical situation was getting worse. (AR at 51, 58.)  He stated that it was difficult for him to sit down because it was very painful for his lower and upper back especially through his shoulder blades with heaviness in his left shoulder. *Id.* Plaintiff also described a major problem with the motion of his neck causing great pain in his left shoulder with numbness in his fingers. (AR at 58-59.)  His medications made him very drowsy, sometimes nauseous, and made him feel like a zombie. (AR at 59.) He also complained of difficulty sleeping, so that he got only three hours of sleep per night. *Id.*

Moura underwent a surgical fusion for his neck pain but testified that the procedure did nothing to help. (AR at 59-60.) He participated in physical therapy, had acupuncture and trigger

---

[8] Moura's previous jobs included painter, polisher, order picker, team leader, manager, and window assembler. (AR at 52-58.)

point injections for his neck pain. (AR at 60.) The trigger point injections eased his pain to some extent although he still felt a lot of discomfort. (AR at 60-61.)

In 2019 Plaintiff had injections in his left shoulder and therapy as well as left shoulder surgery which was not helpful. *Id.* He had lower back problems which were addressed during physical therapy. (AR at 61-62.) Moura also testified that he had a lot of issues with migraines, blackouts and dizziness for which he takes two medications and injections. (AR at 62-65.) The medications for his migraines which he takes daily make him very tired and sometimes nauseous. (AR at 69-70.) He stated that he does not have psychiatric problems but was depressed that he cannot provide for his family. (AR at 72.)  He was not being treated for the condition but was waiting for a response to his request for a therapist. *Id.*

When his wife goes to work, she drops her two younger children at Moura's mother's house and her son at school. (AR at 66.) The older two children take the bus themselves to high school. *Id.* Plaintiff's mother cares for the younger children at her home during the day, and his wife picks them up after work. (AR at 66-67.) Moura stated that he does not perform any household chores. (AR at 67-68.) When his wife leaves for work, he gets up, takes a shower, takes his medication and eats breakfast. (AR at 68.) He watches television and takes a nap or two during the day. *Id.* At lunchtime he goes downstairs and makes a peanut butter sandwich. *Id.* When his wife gets home from work, she makes dinner or orders takeout. (AR at 69.)

D. Vocational Expert's Hearing Testimony.

The vocational expert, Ruth Baruch, reviewed Moura's past work together with the skill and performance level of each job. (AR at 73-75.) The ALJ then posed the following hypothetical:

> Now, assume if you will, that a hypothetical person is of the same age, education, and work background as [Moura]. Further assume that if there is work such a person could perform, it would be subject to the following limitations. This person would be able to lift and/or carry 20 pounds occasionally and ten pounds on a frequent

basis. This person would be able to stand and/or walk for six hours in an eight-hour workday over a 40-hour work week; would be able to sit for six hours in an eight-hour workday over a 40-hour work week; would occasionally be able to climb stairs and ramps, but never ropes, ladders, or scaffolds; would frequently be able to balance; would occasionally be able to stoop; and would frequently be able to crouch, kneel, and crawl. This person would occasionally be able to reach overhead with bilateral upper extremities; would frequently be able to perform gross manipulation with the left upper extremities - - the left upper extremity, I should say. This person must avoid concentrated exposure to unprotected heights and moving and dangerous machinery; however, this person would be able to operate a motor vehicle. This person would have to avoid concentrated exposure to extremes in temperature. This person would be able to understand and carry out instructions for simple, routine tasks and maintain concentration, persistence, and pace in the performance of these tasks for two-hour increments over an eight-hour workday during a 40-hour work week. This person would be able to deal with only minor changes in the workplace. Would such a person be able to perform any of the past work of [Moura]?

(AR at 76.)

Baruch responded that Plaintiff would be able to perform warehouse work as he had performed it, but not as the job is performed in the general economy. *Id.* While Moura could not perform his past work, the expert opined that he could do work as a price marker, a routing clerk or an electrical assembler. (AR at 77.)

Next the ALJ asked Baruch to assume the same hypothetical and limitations, except that the person could only perform sedentary work. *Id*. The expert testified that at the sedentary level the person could work as a document preparer, and eyeglass polisher, or a table worker. *Id.* Asked if there was work for that same hypothetical person who would be off task for 15% of a normal workday on a regular and sustained basis, Baruch opined that the limitations would rule out all work in the regional and national economy. (AR at 78.)

III. Disability Standard and the ALJ'S Findings.

A. Disability Standard.

Eligible claimants for SSI benefits must demonstrate that they are, among other things, aged, blind, or "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(1)(A) ("For purposes of [SSI eligibility], the term 'aged, blind, or disabled individual' means an individual who is 65 years of age or older, is blind . . . , or is disabled (as determined under [§ 1382c(a)(3)]). . . ."); *see Allison M. v. Kijakazi*, No. 22-cv-10033-FDS, 2023 WL 5650100, at *5 (D. Mass. Aug. 31, 2023). "'Disability' is defined, in relevant part, as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Allison M.*, 2023 WL 5650100, at *5 (quoting 42 U.S.C. § 1382c(a)(3)(A)). The impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B). Relevant to the issues presented in this case, "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

ALJs use a familiar five-step test to determine if an individual is "disabled" according to the above definition. 20 C.F.R. § 416.920 (test); *Purdy v. Berryhill*, 887 F.3d 7, 10 (1st Cir. 2018); *Phillips v. Kijakazi*, No. 4:22-cv-10319-IT, 2023 WL 5807344, at *3 (D. Mass. Sept. 7, 2023).

> The test asks questions that are sequential and iterative, such that the answer at each step determines whether progression to the next is warranted: (Step 1) whether the claimant is currently engaging in substantial gainful activity; if not, (Step 2) whether the claimant has a severe impairment; if so, (Step 3) whether the impairment meets or medically equals an entry in the Listing of Impairments; if not, (Step 4) whether the claimant's [RFC] is sufficient to allow [him] to perform

any of [his] past relevant work; and if not, (Step 5) whether, in light of the claimant's RFC, age, education, and work experience, [he] can make an adjustment to other work available in the national economy.

*Sacilowski v. Saul*, 959 F.3d 431, 433-34 (1st Cir. 2020) (citing 20 C.F.R. §§ 404-1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v) (2012)); *see also Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920 (2001)). The SSI applicant bears the burden of proof on steps 1 through 4; at step 5, the burden shifts to the Commissioner to come forward "'with evidence of specific jobs in the national economy that the applicant can still perform,' or else a finding of disability is required." *Purdy*, 887 F.3d at 9-10 (quoting *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001)); *see also Sacilowski*, 959 F.3d at 434; *Seavey*, 276 F.3d at 5. "At that juncture, the ALJ assesses the claimant's [RFC] in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether . . . [he] can engage in any kind of substantial gainful work which exists in the national economy." *Allison M.*, 2023 WL 5650100, at *5 (citing 20 C.F.R. §§ 416.920(g), 416.960(c)).

B. The ALJ's Findings.

The ALJ found that Moura last met the insured status requirements of the Social Security Act on December 31, 2022. (AR at 20.) Plaintiff did not engage in any substantial gainful activity from the alleged onset date, May 5, 2017, through his last date insured. (AR at 21.) Moura was determined to have the following severe impairments through the last date insured: degenerative disc disease of the cervical spine status post discectomy and fusion; left shoulder impingement with acromioclavicular arthropathy status post arthroscopy; left ulnar neuropathy; cubital tunnel syndrome; depressive disorder; and anxiety disorder. *Id*. Through December 31, 2022, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 22.)

10

After a considered view of the entire record, the ALJ ultimately concluded that:

Through the date last insured, [Moura] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [Moura] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk for six hours in an eight hour workday over a forty hour workweek; can sit for six hours in an eight hour workday over a forty hour workweek; can occasionally climb stairs and ramps but never ropes, ladders or scaffolds; can frequently balance, occasionally stoop, and frequently crouch, kneel and crawl; would occasionally be able to reach overhead with bilateral upper extremities; would frequently be able to perform gross manipulation with the left upper extremity; must avoid concentrated exposure to unprotected heights and moving and dangerous machinery; however, could operate a motor vehicle;  would be able to understand and carry out instructions for simple routine tasks and maintain concentration persistence and pace in the performance of these tasks for two hour increments over an eight hour workday, during a forty hour workweek; and would be able to deal with only minor changes in the work place.

(AR at 24-25.)

Plaintiff was unable to perform any past relevant work through December 31, 2022. (AR at 30.) Transferability of job skills was determined to be irrelevant given that, using the Medical-Vocational Rules, Moura would be found not disabled regardless of whether he had transferable skills. *Id*.  At 39 years of age, he was, by definition, a younger individual with a limited education on the last date insured. *Id*. The ALJ decided that considering his age, education, work experience and residual functional capacity, there were significant numbers of jobs in the national economy Plaintiff could perform. *Id*. In conclusion, Moura was found not to be under a disability, as defined by the Social Security Act, at any time from May 5, 2017, the alleged onset date, through December 31, 2022, the last date insured. (AR at 31.)

V. <u>Standard of Review.</u>

Title 42 U.S.C. § 405(g) provides, in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such

11

further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) ("And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high . . . . [i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal citation and quotation marks omitted)); *Libby v. Astrue*, 473 Fed. Appx. 8, 8 (1st Cir. 2012).

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Biestek*, 587 U.S. at 103; *Purdy*, 887 F.3d at 13. As the First Circuit explained:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Purdy*, 887 F.3d at 13; *Carrara v. Kijakazi*, No. 21-CV-10239-DJC, 2022 WL 4111799, at \*2 (D. Mass. Sept. 8, 2022), *aff'd*, No. 22-1861, 2023 WL 7474407 (1st Cir. June 26, 2023).

In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Comm'r of Soc. Sec. Admin.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); *Burton v. Kijakazi*, No. 21-CV-11916-ADB, 2023 WL 2354901, at \*6 (D. Mass. Mar. 3, 2023). Finally, "[e]ven in the presence of substantial evidence . . . the Court may review conclusions of law and invalidate findings of fact that are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen*, 172 F.3d at 35); *see Purdy*, 887 F.3d at 13 ("Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or the courts." (internal quotation marks and citations omitted)).

## VI. Discussion.

Moura argues two grounds for reversal of the Commissioner's decision. It is first claimed that the ALJ erred as a matter of law by failing to perform a proper consistency analysis of Dr. Terlato's opinion. Next Plaintiff contends that the ALJ erred as a matter of law because the consistency analysis of Dr. Haas' opinion is seriously flawed.

## A. Whether the ALJ performed a proper consistency evaluation of Dr. Terlato's opinion.

In his decision, when discussing the assessments of Dr. Terlato and Dr. Ruiz, the ALJ wrote:

> These medical consultants have based their assessments on program knowledge and have supported their opinions with a detailed explanation. Although the medical consultants did not have the opportunity to examine or treat [Plaintiff], their efforts reflect a thorough review of the available records and are supported with sufficient explanation. The undersigned finds that nothing has been admitted into the record to indicate that [Plaintiff's] condition has worsened since these physicians conducted their reviews [or] to indicate that [Plaintiff] had additional limitations during the period at issue. Accordingly, the undersigned finds that these opinions are persuasive regarding [Plaintiff's] physical residual capacity.

(AR at 28.)

According to Moura, this discussion fails to constitute an analysis of consistency.

> The parties agree that
>
> When determining what weight to assign to a medical source opinion, the ALJ must consider the opinion's 'supportability, consistency, relationship, specialization, and other factors.' *Harrison v. Saul*, No. 20-cv-10295, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (citing C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5)). 'The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate.' *Id.* (citation omitted); *see also Nicole C. v. Saul*, No. 19-cv-00127, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020))) (citations omitted) (holding that an ALJ is 'required to articulate' the supportability and consistency of a medical opinion in determining that opinion's persuasiveness); *Vazquez v. Kijakazi*, No. 20-cv-30176, 2022 WL 952764, at *12 (D. Mass. Mar. 30, 2022) (citation omitted) ('The new regulations direct an ALJ to explain how he or she considered the supportability and consistency factors when evaluating medical opinions and making the disability determination.').

*LaRose v. O'Malley*, No. 23-CV-11963-ADB, 2024 WL 4932517, at *16 (D. Mass. Dec. 2, 2024); *Perrino v. Kijakzi*, No. 21-CV-11267-ADB, 2023 WL 2743370, at *7 (D. Mass. Mar. 31, 2023); *Harrison v. Saul*, No. CV 20-10295-LTS, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021).

"[C]onsistency refers to the degree to which a medical opinion or prior administrative medical finding is consistent with the evidence from other medical sources and nonmedical sources in the claim. 20 C.F.R. § 404.1520c(c)(1)-(2)." *Perrino,* 2023 WL 2743370, at *7*; George L., Plaintiff, v. Frank Bisignano, Comm'r of the Soc. Sec. Admin., Defendant.*, No. CV 25-188-PAS, 2026 WL 765550, at *4 (D.R.I. Mar. 18, 2026); *Thorley v. O'Malley*, No. 22-CV-10884-DJC, 2024 WL

1333511, at *10 (D. Mass. Mar. 28, 2024) (citations omitted) ("Under the consistency factor, the ALJ must consider whether an opinion is consistent with the record as a whole."). The regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.' *Martinez* [*v. Kijakazi*], [No. 3:20-CV-30151-KAR], 2021 WL 5054477, at *9 [(D. Mass. Oct. 29, 2021)] (quoting *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01, 5858 (Jan. 18, 2017)))." *Charlot v. Bisignano*, No. CV 24-12610-MPK, 2025 WL 2453650, at *9 (D. Mass. Aug. 22, 2025).

In this case, the ALJ undertook a detailed review of the extensive medical evidence and Plaintiff's testimony. When discussing Dr. Tertalo's opinion, the ALJ clearly stated that "no treating source has opined that [Mouro] has additional limitations." (AR at 28.) Juxtaposed with the lengthy discussion of Plaintiff's medical history, this statement is the essence of consistency. Indeed, the ALJ and Dr. Tertalo reviewed much the same medical evidence. (*compare* AR at 26-27 with AR at 372.) Similarly, as noted above, the ALJ concluded that since Dr. Terlato's June 2202 report, "nothing has been admitted into the record to indicate that [Plaintiff's] condition has worsened since these physicians [Dr. Terlato and Dr. Ruiz] conducted their reviews [or] to indicate that [Plaintiff] had additional limitations during the period at issue." *Id*. This determination underscores the consistency between Dr. Tertalo's findings and those incorporated in Mouro's medical history after Dr. Terlato's report issued. Taken as a whole, the ALJ's opinion meets the minimal level of articulation required by the regulations. *Perrino,* 2023 WL 2743370, at *8 ("Although the ALJ's discussion of the consistency of Dr. Barnes' opinion was minimal, it is sufficient to satisfy the requirements of 20 C.F.R. § 404.1520c(b)(2).").

The cases upon which Plaintiff relies are distinguishable. In *Vazquez,* the ALJ relied on a particular medical report as the primary source of the physical limitations in the RFC. *Vazquez v. Kijakazi*, No. 3:20-CV-30176-KAR, 2022 WL 952764, at *13 (D. Mass. Mar. 30, 2022). The court concluded that "[w]hen an opinion is as riddled with fundamental inconsistencies with the remainder of the record as is Stillson's report, that report cannot properly be treated as persuasive by an ALJ and, in turn, serve as the primary basis for the provisions in the RFC aimed at addressing the functional limitations attributable to a claimant's significant impairments." *Id*. *Vazquez* is factually inapplicable given that the ALJ in the instant case specifically found no inconsistencies. In *Martinez*, the court determined that in finding a medical opinion not persuasive, the ALJ did not evaluate that opinion "with reference to consistency." *Martinez v. Kijakazi*, No. 3:20-CV-30151-KAR, 2021 WL 5054477, at *10 (D. Mass. Oct. 29, 2021). Moreover, the reasons given for finding the medical opinion not persuasive were faulty. For example, "the ALJ did not explain in what way Dr. Usmani's opinions were inconsistent with the longitudinal medical history." *Id*. Again, the present case is different on its facts. Dr. Terlato and the ALJ considered the same medical evidence, and the ALJ found Dr. Terlato's opinion consistent with that medical evidence.

Relying essentially on his own testimony, Moura complains, contrary to the ALJ's findings, that there is evidence in the record that is inconsistent with Dr. Terlato's opinion. However, following his thorough review of the medical records and Plaintiff's testimony, the ALJ concluded "[Moura] is consistently reported to be in no acute distress when presenting for treatment and has a longitudinal record of benign, grossly normal physical exam findings over any 12-month (period) from his alleged onset date of May 5, 2017, through his date last insured of December 31, 2022." (AR at 27.) Further, the ALJ determined "that [Moura's] complaints of constant and incapacitating physical and mental health symptoms are neither reasonably consistent

16

with the medical signs and findings of record . . . The discrepancies between his allegations and the objective medical record, supported by the treatment records of his physicians cannot be resolved in [Moura's] favor based on this record." (AR at 29.) In short, Dr. Terlato's opinion was consistent with the extensive medical record and the record as a whole, particularly bearing in mind that the ALJ rejected Moura's testimony to the contrary. *See Perrino,* 2023 WL 2743370, at *7 (citing 20 C.F.R. § 404.1520c(c)(2); *see also Tucker v. Kijakazi,* No. 21-cv-10317, 2022 WL 18032978, at *13 (D. Mass. Sept. 30, 2022) ("The consistency factor addresses the opinion's consistency with all of the evidence from medical and nonmedical sources.") (internal quotation marks and citations omitted)).

Plaintiff takes issue with the fact that the ALJ increased the limitations of Moura's overhead reaching beyond Dr. Terlato's findings while simultaneously determining Dr. Terlato's opinion to be persuasive. The ALJ's RFC does not conflict with Dr. Terlato's opinion. It merely expanded the occasional overhead lifting limitation from the left arm to both arms, an addition favorable to Moura. "If the ALJ's RFC is 'generally consistent' with the findings in a medical opinion, or if the RFC is 'more favorable' to the claimant than the opinion's findings, then '[t]here is no reason to believe that a further analysis or weighing of [the] opinion could advance [the claimant's] claim of disability.'" *Lopardo v. Berryhill*, No. 3:17-CV-30185-KAR, 2019 WL 1284820, at *11 (D. Mass. Mar. 20, 2019) (further citations and quotation marks omitted). Plaintiff has not demonstrated how he was prejudiced by the ALJ adding his right arm to the overhead lifting limitation. *See*, e.g., *Dube v. Kijakazi*, No. 23-1068, 2024 WL 372841, at *1 (1st Cir. Jan. 16, 2024) ("Further, although the ALJ labeled certain of Dube's claimed impairments 'severe' while state medical consultants deemed them 'non-severe,' any error would be in Dube's favor, and Dube has failed to show how she might have been prejudiced.")

Moura argues that the "error" in failing properly to analyze Dr. Terlato's opinion was not harmless because, but for that error, the ALJ may have reached a different decision.[9] As Defendant rightly points out, this assertion is unavailing. "[Plaintiff's] speculation about the potential effect that crediting the opinion could have on the disability determination is not sufficient to show that the error is harmful. *Williams v. Colvin*, No. 2:13-cv-00125-JAW, 2014 WL 220744, at \*2 (D. Me. Jan. 21, 2014) (noting that the standard for harmful error is not the mere possibility that excluded evidence could affect the decision)." *Thorley*, 2024 WL 1333511, at \*10.

B. <u>Whether the ALJ's consistency evaluation of Dr. Haas' opinion was fatally flawed.</u>

Moura notes that the ALJ characterized Dr. Haas' exam as "generally benign" and further, "[a]lthough not a specific function-by-function assessment of residual capacity, as it is based on the only formal mental status exam of record, this assessment is generally persuasive because it is consistent with the longitudinal record of benign mental status exams." (AR at 28.) However, at Step Two of the five-step test, the ALJ concluded that Moura has severe impairments of depressive disorder and anxiety disorder, among others. (AR at 21.) As a result, Moura contends that the ALJ's opinion is internally inconsistent warranting remand. Plaintiff relies on the decision in *Michael K. v. Kijakazi*, No. CV 20-541MSM, 2022 WL 43497 (D.R.I. Jan. 5, 2022*), report and recommendation adopted*, No. 120CV00541MSMPAS, 2022 WL 1459556 (D.R.I. Feb. 2, 2022). In *Michael K*., the district judge wrote "that the ALJ's actual analysis appears to be inconsistent with her articulation of her reasoning – while purporting to be relying entirely on Dr. Warren and rejecting the Cerbo report as not probative, the ALJ's decision actually appears to reject the Warren findings, in that (with no explanation) it classifies ADHD and 'learning disorder-math' as severe

---

[9] Plaintiff suggests that, had the ALJ not erred, he may have found "a restriction for reaching in other directions (or) a restriction for bilateral handling." (#15 at 15.) However, Moura has not cited any medical evidence or report in the record to support such restrictions.

at Step Two." *Id.* at \*8. In other words, the ALJ erred in relying on a medical report and yet rejecting the same medical report without explanation. That is not comparable to the facts in this case.

Here, the ALJ found that Moura had severe impairments at Step Two. However, "Step Two is meant to be a '*de minimis* screening device' for 'groundless claims' and for 'applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled.'" *Conrad v. Kijakazi*, 666 F. Supp. 3d 161, 172 (D. Mass. 2023) (quoting *McDonald v. Sec'y of Health and Human Servs.*, 795 F.2d 1118, 1122–23 (1st Cir. 1986)). Further, "once the ALJ finds any severe impairment, when residual functional capacity is calculated at Step Four, the ALJ must consider the limitations imposed by all impairments, regardless of their severity." *Id.* (citations omitted); *Diane K. v. Kijakazi*, No. CV 22-215WES, 2023 WL 8713695, at \*6–7 (D.R.I. Dec. 18, 2023).

The finding of severe impairment at Step Two is not inapposite to RFC findings based on benign medical reports. *Maillet v. Colvin*, No. CV 15-13365-MGM, 2016 WL 3676142, at \*\*4, 6 (D. Mass. July 7, 2016) (ALJ found severe mental health impairments at Step Two but health improvements "supported by many benign mental status examinations and Plaintiff's extensive household responsibilities" when formulating the RFC.); *see also Valle v. Berryhill*, 444 F. Supp. 3d 299, 311–12 (D. Mass. 2020). In another case, the plaintiff was found to have severe physical and mental impairments, but "the ALJ's assessment of Dr. Jensen's opinion is supported by the record…. Dr. Jensen's opinion is in accord with the benign mental status examinations." *Shatema B. v. Saul*, No. 1:19-CV-00566-NT, 2020 WL 4383802, at \*3 (D. Me. July 31, 2020), *report and recommendation adopted sub nom. Shatema B. v. Soc. Sec. Admin. Comm'r*, No. 1:19-CV-00566-NT, 2020 WL 4757063 (D. Me. Aug. 17, 2020). Again, the standard applied at Step Two to an

19

impairment is *de minimus;* the standard at Step Four is different – the ALJ must consider all the evidence in the record and the limitations arising from all impairments.

IV. Conclusion.

The challenged consistency analyses were properly performed, and the ALJ's opinion is supported by substantial evidence. Therefore, Plaintiff's Motion for Judgment on the Pleadings (#14) is DENIED and Defendant's Motion to Affirm the Decision of the Commissioner (#18) is GRANTED. Judgment shall enter for the Commissioner of Social Security.

March 26, 2026                          /s/ M. Page Kelley
                                        M. Page Kelley
                                        United States Magistrate Judge